1

1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF TEXAS
2             HOUSTON DIVISION

3   UNITED STATES OF AMERICA       ()        CRIMINAL ACTION
                                   ()        NO. H-07-226
4   VS.                            ()        HOUSTON, TEXAS
                                   ()        SEPTEMBER 3, 2010
5   JAMES EARL DUNN, JR.           ()        9:04 A.M.

6

                        TRANSCRIPT OF SENTENCING
7             BEFORE THE HONORABLE LEE H. ROSENTHAL

8

9   APPEARANCES:

10

    FOR THE GOVERNMENT:       Mr. Quincy Ollison
11                            Assistant United States Attorney
                              910 Travis, Suite 1500
12                            Houston, Texas   77002

13

    FOR THE DEFENDANT:        Mr. Tom Berg
14                            Assistant Federal Public Defender
                              440 Louisiana, Suite 310
15                            Houston, Texas   77002

16

    COURT REPORTER:           Anita G. Manley
17                            Official Court Reporter
                              515 Rusk, Rm. 8016
18                            Houston, Texas   77002

19

20   Proceedings recorded by stenographic means, transcript produced
     by computer.
21

22   THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
     CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
23   COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
     ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
24   COPY AT THE OFFICIAL RATE.
        *General Order 94-15, United States District Court, Southern*
25   *District of Texas.*

2

1         P R O C E E D I N G S

2              THE COURT:  Go ahead and state your appearances in

3    United States versus Dunn.

4              MR. OLLISON:  Good morning, Your Honor.  Quincy

5    Ollison for the United States.

6              MR. BERG:  Tom Berg for Mr. Dunn, who is present.

7              THE COURT:  All right.  Come on up, please.

8                   Let me first ask if the Government has given the

9    appropriate notice to potential -- to victims of this hearing?

10             MR. OLLISON:  Yes, Your Honor.

11             THE COURT:  All right.  I have received this morning a

12   number of victim impact letters and statements.  Have you

13   provided those to counsel for the defendant?

14             MR. OLLISON:  Your Honor, I have not received them.

15             THE COURT:  And what's the reason for that?

16             MR. OLLISON:  Well --

17             THE COURT:  I mean, you haven't even seen them?

18             MR. OLLISON:  I've received --

19             THE COURT:  Okay.

20             MR. OLLISON:  I have seen statements that I got from

21   our victim witness coordinator earlier in the week for J&J

22   Community Center, Johnson and Johnson, Stephanie Slattery

23   (phonetic), Claire Stevens, Herbert Samuels, The Care Solution,

24   and Dora Denman.  That's all I have.

25             THE COURT:  I have a number of other ones.  Do you

1   have any of these?

2          MR. BERG:  I have none.

3          THE COURT:  Okay.  There is a problem here that needs

4   to be addressed.  It is a problem of communication and

5   organization.  I got these this morning.  Some of these are

6   dated back in mid August.  Counsel for the defendant has none

7   of them.  I don't understand where the communication lapse is,

8   but this was already continued in order to ensure that everyone

9   had a fair opportunity to respond to the Government's request

10   for an upward departure; and that's fine.  But it's not an

11   adequate opportunity if the counsel for the defendant and the

12   Court don't have, in sufficient time to read and digest them,

13   part of the basis that the Government is going to use to

14   justify its request.  It's just frustrating to be -- I'm sure

15   it's frustrating for you, too, Mr. Ollison.

16          MR. OLLISON:  Absolutely it's frustrating.  I don't --

17          THE COURT:  And I'm not blaming anyone.

18          MR. OLLISON:  I don't take it lightly.

19          THE COURT:  I am worried about an apparent systemic

20   problem if the victim witness statements, which are important,

21   don't get beyond the victim witness coordinator's desk.

22          MR. OLLISON:  Well, Judge, don't blame the system.

23   Blame me.  And I don't offer the Court any excuse other than I

24   have been in trial in Judge Hittner's court for the past two

25   weeks every day.  We're starting up this morning at 10:00.

4

1   It's my fault that everyone has not gotten their impact --

2   these statements in sufficient time for the Court and counsel

3   to review.  I accept full responsibility.  It's not a systemic

4   problem.  The problem lies with me.  I've been in court.  I'm

5   going to be -- tomorrow we will be out of the court.  I can

6   make certain that everything is in order; but prior to this

7   time, I have no other excuse but to tell the Court that I've

8   been in trial.

9          THE COURT:  Everyone is busy and I understand that,

10  but we do have victims here and I suspect some of them have

11  traveled some distance to be here.  And I'm -- so to add insult

12  to injury, if you will, the very victims who exercised their

13  statutory right to be present are going to be further

14  inconvenienced if this has to be continued again.  It's just

15  not the way the system is intended to work, obviously.

16         MR. OLLISON:  And -- and I accept full responsibility.

17  So, whatever the Court wants to do I'm prepared to accept.

18         THE COURT:  Mr. Berg?

19         MR. BERG:  A couple of matters.  My client pled guilty

20  in August of 2008.  The Government has had a full year up to

21  the last sentencing date to provide this information to the

22  probation office and did not.

23         THE COURT:  Most of this information wasn't gathered

24  until August of 2009.

25         MR. BERG:  Which is after the sentencing date.  The

5

1    initial response of the Government to the presentence report

2    was no basis for upward departure, no objections, so forth.

3         THE COURT:  Well --

4         MR. BERG:  So, something -- something is happening at

5    the end of this case after two years, for which we have had no

6    notice and continually had no notice.  And even the statement

7    that the Government filed after 6:00 o'clock, two days ago, we

8    didn't get until yesterday.  I know the probation office was in

9    training, so they had no opportunity realistically to respond

10   to it.

11        THE COURT:  I got it this morning.

12        MR. BERG:  And I got -- I was only able to provide a

13   late and rather cursory response to it myself.  But this case

14   has dragged on way too long and needs to come to an end --

15        THE COURT:  I don't disagree.

16        MR. BERG:  -- for everybody, victims, Mr. Dunn,

17   everyone.  And --

18        THE COURT:  I don't disagree with that, but I also --

19   so, we're balancing the cost of an additional delay and

20   continuance against the cost of proceeding with an inadequate

21   opportunity to consider information that at least the

22   Government is, I understand, taking the position needs to be

23   considered and, frankly, I think the statute requires me to

24   consider.

25        MR. BERG:  Well, I'm not sure that it does.  In this

1   case, my objection was sustained as to who is the victim in

2   this case.  The victim is the Government.  And --

3         THE COURT:  Well, for the purpose of loss calculation,

4   I think you are right.  For the -- if you look at the

5   definition under the CVRA, it's a much broader definition.  So,

6   I don't think that you are right in terms of -- if the

7   consequence of your statement is to suggest that the victim

8   impact statements and letters that have belatedly been received

9   should not be considered at all.

10         MR. BERG:  Well, of course, I don't even know what's

11   in them, so it's difficult for me to have any other response.

12         THE COURT:  Well, it's cost versus cost.  And I think

13   at the end of the day, the bigger cost given where we are now

14   is if we were to proceed with inadequate opportunity to

15   consider the information before me.  So, it is with great

16   reluctance that I think that we -- that we do need some

17   additional time.  I'm happy to postpone it until later today if

18   that's going to give you enough time.

19         MR. OLLISON:  If the Court wishes to do it today, and

20   I understand --

21         THE COURT:  5:00 o'clock is fine.

22         MR. OLLISON:  Well, Judge Hittner recesses at 6:00

23   o'clock.

24         THE COURT:  6:00 o'clock is fine.

25         MR. OLLISON:  That's good for me.

7

1          THE COURT:  If that works.  If it doesn't work for the

2     defense, I'm not going to make them do it.  It's not their

3     fault that we're in this position.

4          MR. BERG:  I'll make it work.

5          MR. OLLISON:  I understand.

6          THE COURT:  All right.

7          MR. BERG:  But I need to see everything.

8          THE COURT:  Would you please make a copy of this, Ms.

9     Eddins, and make sure that it's given to counsel for the

10    defendant?

11          I want you to check it, Mr. Ollison, and make

12    sure we've got everything.

13          MR. OLLISON:  Sure.

14          THE COURT:  All right?

15          MR. BERG:  And I guess I need to know if there's going

16    to be testimony as well and if I have access to witnesses.

17          MR. OLLISON:  I don't anticipate calling any

18    witnesses.

19          THE COURT:  All right.  Are you aware of any of the

20    victims who want to speak?

21          MR. OLLISON:  I'm not.

22          THE COURT:  All right.  Good.  And we do have the

23    statements.  All right, 6:00 o'clock.  And I apologize for the

24    delay but I think that's the only appropriate response.

25          MR. OLLISON:  Your Honor, the court adjourns at 6:00.

8

1    Could you just give me a little bit of time to get from the

2    courtroom?

3         THE COURT:  I have to be somewhere at 7:00, so no.

4    The answer to that, Mr. Ollison, is simply "no."  Perhaps you

5    could ask Judge Hittner if he could recess at about five

6    minutes early.

7         MR. OLLISON:  I understand where -- the position I'm

8    in.

9         THE COURT:  All right.  I will see you all at 6:00.

10        MR. OLLISON:  6:00 o'clock.

11        THE COURT:  Yes, sir.

12      (Recess from 9:13 a.m. to 6:00 p.m.)

13        THE COURT:  Go ahead and state your appearances again,

14   please.

15        MR. OLLISON:  Quincy Ollison for the United States.

16        MR. BERG:  Tom Berg for Mr. Dunn, who is present.

17        THE COURT:  Come on up, please.

18         Mr. Berg, have you and your client now had time

19   to review in more detail the memorandum prepared by the United

20   States and the victim impact statements that have been

21   submitted?

22        MR. BERG:  Yes, Your Honor.

23        THE COURT:  Are you prepared to go forward at this

24   time?

25        MR. BERG:  We are.

1            THE COURT:  All right.  Thank you.

2                 I don't -- all the objections that were

3     previously filed have now been taken into account in the

4     addendum and the revised guideline calculations.  So, where we

5     are now is the Government asking for a non-guideline variance,

6     upward departure above the range which, if the guidelines were

7     to be followed, would be at an offense level of 15, a criminal

8     history category of I, would lead to an 18- to 24-month

9     sentence.

10                The Government is asking for a sentence that is

11    calculated by putting the offense level in guideline terms at

12    20, which would lead to a 33- to 41-month sentence.  And in

13    support of that request, the Government has submitted its

14    memorandum and the victim impact statements.

15                One -- two points with respect to the victim

16    impact statements.  One is the question, how they ought to be

17    filed.  The way they are obtained includes information that,

18    under the local -- under the national rules, has to be redacted

19    before they can be filed unless they are filed under seal.

20    Like telephone numbers --

21            MR. OLLISON:  I understand.

22            THE COURT:  -- in criminal cases, home addresses,

23    cannot be filed in the PACER system, CM/ECF, without redacting

24    those identifiers.

25            MR. OLLISON:  I understand that.  I am aware.

1    THE COURT:  I would prefer to file them rather than

2    file them under seal because I have -- in general, documents

3    filed for the Court's consideration are properly, presumptively

4    public, but that will mean that the U.S. Attorney's Office has

5    to do the redactions before they can be filed.

6    MR. OLLISON:  Your Honor, I will be out of trial on

7    tomorrow and I will personally redact each one.

8    THE COURT:  All right.

9    MR. OLLISON:  And submit them to the Court.

10   THE COURT:  So, the originals, unredacted, will be

11   filed under seal.  The redacted versions will be filed in the

12   usual fashion.  All right?

13   MR. OLLISON:  Very well.

14   THE COURT:  Good.  Thank you very much, Mr. Ollison.

15   All right.  At this time -- there's also a fine

16   amount, but given the fine range and given the amount of

17   restitution, I'm not going to impose a fine on top of that.

18   At this time I would invite counsel and Mr. Dunn

19   to make any statement that Mr. Dunn wishes on his behalf.

20   MR. BERG:  I think --

21   THE COURT:  And I want to hear the statement before I

22   rule on whether a non-guideline/departure sentence is

23   appropriate.  Does that clarify?

24   MR. BERG:  Did you want me to address the

25   appropriateness of the non-guideline sentence?

1        THE COURT:  I do.

2        MR. BERG:  Okay.  Now I understand where you're going.

3        THE COURT:  Allocution/argument.

4        MR. BERG:  I do not believe, as I submitted in my

5   response, even after reviewing the victim impact statements,

6   that a non-guideline sentence is called for in this case.

7        In part, I do not believe that the victim impact

8   statements support a five-level upward adjustment, which is

9   what the Government suggests is appropriate.  The one from the

10  state agency is, I think, problematic.  It throws out large

11  numbers, but it doesn't say when these occurred.

12       We're talking about discrete conduct which

13  occurred seven years ago in the indictment, 2002.  I know that

14  Mr. Dunn had been in business, even according to the

15  Government, since 1997.  I don't know what the reference back

16  is, what point is the reference back for purposes of this

17  proceeding in the State's claim, which would be, I guess, the

18  first victim impact system from the Texas Department of

19  Assistive and Rehabilitative Services.

20       They also at least suggest that their employees

21  may have been complicit.  They incurred expenses as a result of

22  the Federal Government auditing them for their inefficiencies

23  and then tried to attribute those expenses to Mr. Dunn.

24  Without a much better accounting of all of this money, we can't

25  take the blame for whatever it was that they were failing to do

1  for many years, nor do I think that we can accept their

2  attribution of fault entirely on Mr. Dunn.  There may have been

3  other people who were engaging in similar conduct.  There may

4  have been, as they suggest, state employees who were engaging

5  in fraudulent conduct from within that occasioned an

6  undetermined amount of this loss figure.

7          So, I don't think that this is reliable in terms

8  of trying to figure out how much should be apportioned to Mr.

9  Dunn other than what was already established through the

10  presentence report and through the Government's stipulation at

11  the time of the guilty plea, which was in the area of $335,000.

12          THE COURT:  Which is still the figure used for

13  restitution.

14          MR. BERG:  Which is still the figure used for

15  restitution, but I think that is the only ascertainable figure

16  for actual loss.  We would have to go over $400,000 to get to

17  the next level in the fraud guideline, which would bump it up

18  by two levels.  So, that does not push us up.

19          THE COURT:  Well, I understand your argument, but it

20  strikes me listening to you that your argument is more what I

21  would be hearing if I was being asked not to go to a higher

22  guideline level; and that's not what this request is.  This

23  request is to -- is not that the guideline was miscalculated or

24  understated but that the properly calculated guideline does not

25  adequately capture the seriousness of the offense.

1          MR. OLLISON:  That's correct, Your Honor.

2          MR. BERG:  But the way the Government presented it in

3   its motion for upward departure was to ask for a five-level

4   increase.  So, relating it back to the guidelines as a

5   reference, I don't see how they get there from here.  And

6   that's the reason I'm talking --

7          THE COURT:  I think the argument -- and, again, I

8   should let Mr. Ollison say it -- I think the argument is that

9   the guideline level was properly calculated because -- for

10  reasons that are set out in the guidelines themselves,

11  additional amounts of money could not be included in

12  determining the guideline loss but that because, as a result,

13  it is an understatement of the seriousness of the offense, a

14  higher number should be considered.

15         MR. BERG:  Then addressing -- then addressing the

16  Texas Department of Assistive and Rehabilitative Services'

17  claim here, it diverts responsibility from, I think, what its

18  charter is from, in part, by laying all of the blame on Mr.

19  Dunn.  And I don't think that it's either supported by facts or

20  fair in this case.

21              There's no doubt that he committed a substantial

22  fraud.  We don't dispute that.  He pled guilty to it.  They do

23  not articulate where his fraud stops and their other frauds

24  begin or their inefficiencies begin or their failures to comply

25  with their legal obligations for oversight come or the expenses

1  that they had -- they don't even break out the expenses that

2  they had to incur because the Federal Government came in

3  because they failed to perform their oversight.  He's not

4  attributable to that.  That is part of their job.

5          So, I discount their claims here as being

6  something that the guidelines failed to take into account

7  because, really, what they're talking about is a numerical

8  figure that would justify an increase; and they don't, I don't

9  think, by a preponderance of the evidence establish that.

10          It's a little bit different when we're talking

11  about some of the individuals who claim what they were harmed

12  as opposed to the agency.  And, in fact, the agency was taken

13  into account in the guideline.  It is the victim.

14          Now, I realize that Ms. Slattery's statement is

15  unsigned.  And, again, she's from the agency and she's talking,

16  I guess, about the personal feelings of members of the agency

17  who are disturbed or disillusioned because of what happened.

18  I'm not sure that that's a cognizable harm either as opposed

19  to, I think, some of the more telling statements from

20  individuals who actually said that they had a loss, a personal

21  loss, because they incurred out-of-pocket expenses or they were

22  individuals who should have received training and didn't.  And

23  because of, I guess, the Byzantine aspect of the guidelines

24  that were involved, the rehab guidelines, if they were presumed

25  to have received the training, then they couldn't come back for

1    two years even if they didn't get it.

2            These are people who were harmed.  I understand

3    that part, as distinct from these rather global claims that the

4    agency itself suffered some kind of emotional harm over what

5    happened and they're trying to place the blame on Mr. Dunn for

6    it.  I still do not see how that would take this matter outside

7    of the range of punishment that the Court may consider in this

8    case.  Again, we're trying to resurrect from information that

9    is now seven years old, and I do not think it's fair to go

10   beyond the indictment to matters that were never charged that

11   are long since time-barred, which again is, I think, part of

12   the state agency's purported claim.  Because we have no way to

13   respond to that.  We've never been accused, and then to face it

14   in sentencing for this offense I don't think is appropriate.

15            The concern that there were innocent victims,

16   vulnerable victims, who were utilized and, in a sense,

17   victimized as a course of this fraud is, I think, more an

18   appropriate focus than the agency itself.  And that may be

19   where the guideline does not take them into account as victims,

20   per se, because it does focus on the governmental loss of money

21   as opposed to the impact on individuals who did not get the

22   training, individuals who were given checks that were no good.

23            And that is offensive conduct.  The question is:

24   What does the Court do with that offensive conduct?  If you try

25   to quantify it monetarily within the guidelines, you're

1   probably still not going to get to $400,000 in the next level.

2   But at the same time, I don't think you can equate it to a

3   million-dollar fraud, which is what the Government is

4   essentially arguing, because it was never that.  And that's the

5   hard nut as I see it.

6          THE COURT:  Thank you, Mr. Berg.

7              Mr. Dunn.

8          THE DEFENDANT:  Yes, Your Honor.

9              As previously stated, I totally take

10  responsibility in my role as the CRP director, community

11  rehabilitation program director, for Rehab Specialists.  And I

12  take total responsibility for the failure of leadership as it

13  relates to proper oversight of our programs and not performing

14  my job the way I should have performed it and my actions which

15  resulted in inaccurate reporting on our clients.  And I totally

16  take responsibility for that.

17         THE COURT:  Thank you, sir.

18             Mr. Ollison.

19      MR. OLLISON:  Your Honor, I think the Court is well

20  within your authority to look at with respect to the Texas

21  Rehabilitation Commission figures because it shows the breadth

22  of what this defendant did.

23             They indicate -- and while Mr. Berg says it's

24  unsubstantiated, I think the Court can rely on the

25  representation of the state agency.  They have no reason to

1   misrepresent the figure.  This amount of six -- six point --

2   $1.6 million over a five-year period of time shows the breadth

3   of Mr. Dunn's conduct.  It was his conduct that -- in which he

4   engaged in the fraudulent billing of these -- submission of

5   these claims that caused the agency to pay out that amount.

6            Now, the fact that we only indicted on the

7   $330,000 does relate to guideline -- for guideline calculation

8   purposes, but the fact of the matter is the Court can consider,

9   under related conduct, the amount -- the breadth of the scheme

10   to defraud, and it was highly substantial.  I mean, this wasn't

11   just, you know, 50, 60, $120,000 fraud.  This exceeds a million

12   dollars.  And I think that alone takes it out of the narrow

13   construct of the amount that was calculated under the

14   guidelines.

15            Now, I say that because when we take a step back

16   and look at not only the fact that this man got that amount of

17   money, what did he do with it?  And I think I have in my -- in

18   the victim impact statements and in my memorandum to the Court

19   outlined aggravating factors that the Court should consider in

20   upwardly departing to a higher sentence for Mr. Dunn.

21            He preyed upon the least and the weakest among

22   us.  He was supposed to provide the training for them, and he

23   didn't.  He gave them bogus money orders when they were

24   expecting to be paid.  And even with the contracts that he had

25   with the activity centers that provided transportation, he

 1    didn't pay them.  And he had the audacity to stand before this

 2    Court on August 12th and say he did not benefit financially

 3    from this.  That was totally incorrect.  He got all the money.

 4    And not only did he get 330,000, he got substantially the 1.6

 5    million.  And I think the Court should consider that.

 6              And then to not pay his employees, to not

 7    properly account for withholding, to not -- to give them hot

 8    checks as well is just very callous, very egregious.  And it's

 9    not just emotional to consider this and it's not -- it's not,

10    as Mr. Berg said, emotional harm.  This is real harm, and it's

11    harm that I don't think Mr. Dunn has gotten the message.  I do

12    not believe that a sentence between 18 to 24 months is

13    appropriate for him.  He's hurt too many people directly.

14              And, you know, Judge, even if you set aside the

15    $1.6 million, the money involved in it, and even if you set

16    aside the fact that he got the majority of it, the focus is on

17    the least and the weakest among us of what he did.  And I

18    believe that justice requires a sentence not just based on

19    guideline calculations and monetary loss but the actual harm

20    that he has inflicted on the lives of these people.

21              And, Judge, it wasn't just a few of these

22    clients.  There were hundreds of people who went to him for

23    training and didn't get it.  And I submit he abused, he took

24    advantage, of each and every one of them.  And 24 months, even

25    18 months, is just a slap on the hand; and, therefore, I

1   strongly suggest to the Court that you consider a sentence that

2   the United States has recommended.

3          You know, I didn't take an oath just to, you

4   know, herd people up and send them to jail for what I think was

5   sufficient evidence to -- for them to go to jail.  I took an

6   oath to strike a hard blow for justice, and I submit to this

7   Court that this defendant deserves to be punished upwardly from

8   the range that has been calculated by the guidelines and that

9   he should -- he should for retribution and for deterrent sake

10  be punished at a sentence of 41 months.

11         THE COURT:  Thank you.

12         Anything further?

13         MR. BERG:  Had Mr. Dunn performed as he was supposed

14  to and provided for these disabled people, there would have

15  been no fraud.  We know there was a fraud because he didn't do

16  what he was supposed to for these people.

17         To a certain extent, I can see that we have not

18  taken into account what has happened to these disadvantaged

19  people as a consequence of this opportunity lost.  That is an

20  unaccounted for harm in my mind.  But when we start talking

21  about the state agency and its problems, I think we're off into

22  the kind of gooey thing which is not substantiated with what

23  we've got before us today, nor can we lay it all at Mr. Dunn's

24  feet in any quantifiable way.

25         MR. OLLISON:  But he got the money, Your Honor.  He

1    got the money.

2        MR. BERG:  Well, we don't know what money he got based

3    on what's here.

4        THE COURT:  What happened to the money?  It was paid

5    to his company.  He owned the company.

6        MR. BERG:  Well, but he also didn't completely fail to

7    perform services over all these years.  And the money that is

8    quantified by the state agency includes their costs, their

9    investigative costs, their response to the federal audit.

10       THE COURT:  Not --

11       MR. OLLISON:  They reduced that.

12       MR. BERG:  I've repeated myself now.  That's the

13   problem with what we've got from the state agency, is it's not

14   an accounting.

15       THE COURT:  We don't have an accounting.  What we do

16   have is from the agency, from individuals who were or should

17   have been consumers of the services, and from others who are

18   knowledgeable about the kinds of -- who are also involved in

19   the kind of work that Mr. Dunn was holding himself out as

20   providing, Advocacy Inc.

21            What we do have is a collective request that,

22   putting aside the additional amounts of money, is a collective

23   request that we step back and really look hard at the nature of

24   the fraud, not merely the fact of it, not merely the amount of

25   it but the nature of it.  And I think that's an appropriate

1   step and point.

2            What I'm being handed are some faxed materials

3   that have just come over from an additional victim who

4   apparently did not get notice in time to be present, called and

5   wanted to submit a statement.  I have looked at it.  Her

6   daughter was employed at Rehab Specialists for a couple of

7   years, and she had some additional points she wanted to make,

8   not different from what we've already seen.  So, this will also

9   be part of the record.  It is similar to what has already been

10  stated.

11           So, let's step back for a moment and look at the

12  3553(a) factors because the guidelines are advisory only.  And

13  the Government, I want to repeat, is not asking me -- and I

14  don't have a sufficient record for the reasons that Mr. Berg

15  has pointed out -- is not asking me to recalculate the

16  guidelines to get to a higher offense level and, therefore, a

17  higher sentence taking into account more fraud losses.  That's

18  not what we're doing.

19           What the Government is asking me to do is to

20  impose a non-guideline sentence under 3553(a) that better

21  reflects and better takes into account, above all else, the

22  seriousness of the offense.  Is that a --

23           MR. OLLISON:  That's exactly right.

24           THE COURT:  -- fair summary?

25           So, let's go back briefly -- and this will be

1  brief because I think we've all said pretty much what needs to

2  be said -- to the PSR itself, back to October of 2004 when Mr.

3  Dunn was interviewed.

4          And what he said to the agent back then kind of

5  jumped out at me when I looked back at it again in the context

6  of what we were talking about here today.  He admitted that his

7  company was having severe cash flow problems.  He, therefore,

8  told his employees to add to the coaching logs that were

9  submitted to payment.  He had them to show that a lot more

10  services had been provided and hours had been spent than, in

11  fact, was the case.  So, he was cheating the clients and

12  cheating the TRC.

13          He told the agents that he intended to make up

14  those hours but he needed the cash, so he instructed his

15  employees to falsify the records.  And he never went back to

16  make it up.  He understood it was fraudulent.  He continued to

17  have his employees falsify those time logs and he admitted that

18  because RSI wasn't providing training, they shouldn't have been

19  paid.

20          He also said that he brought people to TRC to

21  enroll them under the training programs and, basically, he

22  brought them in from the streets.  He just threw bodies, got

23  their names, didn't -- couldn't verify the information they

24  provided.  So he, basically, just got a name, a body attached,

25  used it, and put it back.

1          Now, what I heard Mr. Dunn say to me today also

2   resonated.  What I heard Mr. Dunn say just a few minutes ago --

3   and I wish I had written it down, but I think I remember it.

4   He acknowledged a failure in leadership.

5          MR. OLLISON:  That's what I --

6          THE COURT:  He said he didn't have proper

7   supervision -- didn't use proper supervision of employees, poor

8   bookkeeping.  That's not what this was about.  And if that's

9   what Mr. Dunn thinks he's being sentenced for, he's wrong.  And

10  he has not -- although I'm not suggesting a guideline change,

11  he hasn't accepted responsibility.

12          That's not what this is about, Mr. Dunn.  What

13  the victims asked and what the Government has asked this

14  sentencing to look at I don't think -- is not reflected in the

15  statement you made to me in any way, shape, or form.

16          I agree with the Government to some extent that a

17  sentence within the guideline range is inadequate to reflect

18  the seriousness of the offense.  I do not agree with the

19  Government that it should be ramped up by five levels, putting

20  it into guideline terms, to approximate a monetary sum that we

21  just don't have the records or the accounting background --

22  backup to support.

23          That would, I think, misstate what this

24  non-guideline sentence is based on.  It's not based on a

25  forensic accounting approach.  It is based on a determination

1   that the guideline range understates the seriousness of the

2   offense and the extent of different kinds of harm imposed.

3          Some of it was financial, and the impact

4   statements speak to that.  Some of it was a harm to the very

5   basis of these kinds of services and their ability, frankly, to

6   continue and some, most profoundly, to the individuals that

7   these services are intended to help.  We may be frustrated at

8   the system that compounds the harm by saying to people who

9   didn't get the training because of the fraud that they now

10  can't get the training that they otherwise would have qualified

11  for.  That does not seem right.

12          But that is something that Mr. Dunn was fully

13  aware of because he knows these systems, which leads to the

14  question -- simply restates the question, what is the

15  appropriate sentence under 3553(a), a question that is more

16  difficult to answer at this point because of the amount of time

17  that has passed since this offense occurred.  Mr. Dunn does not

18  come with an unblemished record; he has a prior forgery

19  conviction.  But it's an old one, goes back to 1990.  So, we

20  again have the problem of the passage of time, making it more

21  difficult to frame an appropriate sentence but no less

22  necessary.

23          Looking at all of the factors that 3553(a)

24  requires me to consider, the nature and circumstances of the

25  offense, the history and characteristics of the defendant, Mr.

1   Dunn knew full well what he was doing and he knew full well the

2   harm.  He may not have thought about it, but he had the

3   knowledge to understand the harm that he was doing at all the

4   different levels that I've described.  And he did it for money.

5   He did it for greed.  Because the money -- I think Mr. Ollison

6   was right about that.  The money went to him, and it was a lot

7   of money.

8              Taking all of the factors into account, I believe

9   that an appropriate sentence is a 33-month sentence.  It is,

10  essentially, in between the 24-month and the 41-month bench

11  marks.  It is above the highest end of the guideline level that

12  would apply.  It does not get to the levels that the Government

13  asked me to get to, but it is a significant sentence,

14  particularly for a man who has done no prison time ever despite

15  a criminal history, as I've referred to.  I believe that that

16  sentence comes closer than the guidelines and is the

17  appropriate sentence under 3553(a).

18             It is, therefore, this Court's judgment, Mr.

19  Dunn, that you be committed to the custody of the Bureau of

20  Prisons to be imprisoned for a term of 33 months.

21             When you are released from prison, you will be on

22  supervised release for three years.  Within 72 hours of your

23  release, you must report in person to the probation office in

24  the district to which you are released.

25             On supervised release, you must follow all the

1   conditions of supervised release.  They include the following:

2   You may not commit a federal, state, or local crime.  You must

3   comply with all the standard conditions, which include that you

4   may not possess a firearm, ammunition, destructive device, or

5   other dangerous weapon.

6           You are prohibited from employment or acting in

7   any fiduciary role during the term of supervision.

8           You must pay restitution in the amount of

9   $335,955.  That is a term of your sentence.  Full payment is a

10  condition of supervised release.  The payment is to be made to

11  the Department of Assistive and Rehabilitative Services.  The

12  address will be set out in the judgment.

13          Because I'm imposing the restitution amount, you

14  must provide the probation officer with access to any requested

15  financial information, and you are prohibited from incurring

16  new credit charges or opening additional lines of credit

17  without the approval of the probation officer.

18          I find no ability to pay a fine on top of the

19  restitution and I will waive it.  I do order that you pay the

20  mandatory special assessment of $100, which is due immediately.

21          You must also cooperate in the collection of a

22  DNA sample if that is authorized.

23          You must make a lump sum payment of $100 due

24  immediately.  The balance is due in payments of monthly

25  installments of $1,000 over a period of three years to begin 30

1    days after your release from prison to a term of supervision.

2    Payment is to be made through the District Clerk of the

3    Southern District of Texas.

4                    Do either counsel or the Probation Office know

5    any reason why this statement cannot be imposed -- this

6    sentence?

7            MR. OLLISON:  Not from the United States, Your Honor.

8            MR. BERG:  No, Your Honor.

9            THE PROBATION OFFICER:  No, Your Honor.

10           THE COURT:  I don't believe there's any basis for

11   appeal that survives the plea agreement.

12           MR. BERG:  There is not, Your Honor.

13           THE COURT:  If you want to file a notice of appeal,

14   you must file a notice of intent to do so -- if you want to

15   file an appeal, you must file a notice of intent to do so

16   within 30 days from -- within 10 days from the date the

17   judgment is entered.  If you want a lawyer to represent you on

18   an appeal, you may ask the Court to appoint one for you if you

19   cannot afford one.  Do you understand those rights?

20                    Voluntary surrender?

21           MR. OLLISON:  Yes, Your Honor.

22           THE COURT:  All right.

23           MR. OLLISON:  And, further, Your Honor, I make an oral

24   motion, to be followed up by a written motion tomorrow, to

25   dismiss Counts 1 through 41 and Counts 43 through 55.

28

1      THE COURT:  All right.  I'll look for the motion.

2           Anything further?

3      MR. BERG:  My client has signed the supervised -- I

4  mean, the voluntary surrender documents, and I believe the

5  marshals are prepared to take care of his fingerprinting here

6  in the courtroom.

7      THE COURT:  All right.

8      MR. BERG:  So that they can go home.

9      THE COURT:  Very good.  Thank you.

10      MR. BERG:  Thank you.

11      THE COURT:  Do you have the impact statements?

12      MR. OLLISON:  Yes, Your Honor.

13      THE COURT:  All right.  Here is a copy of the

14  additional one that came in.  That should also be made part of

15  the record.

16      MR. OLLISON:  Thank you.

17      THE COURT:  We'll make a copy.

18      MR. OLLISON:  Sure.

19      THE COURT:  Make a copy and give one to Mr. Berg as

20  well.

21      (Concluding at 6:35 p.m.)

22

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
23  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, TO THE BEST
OF MY ABILITY.

24
                                    5/10/10
_____
25  ANITA G. MANLEY
OFFICIAL COURT REPORTER